JOHNSTON, District Judge:
The Government appeals the district court’s order granting Kevin Newland’s motion to suppress evidence seized from a search of his rental vehicle on September 21, 2005. Based on statements given to officers and immigration agents on the road side and while in state custody, Mr. Newland was indicted for falsely and willfully representing himself to be a citizen of the United States. On the merits, we reverse the district court’s suppression order because the trooper who stopped Mr. Newland had reasonable suspicion to detain him until the canine unit scanned the vehicle. Once the canine alerted to the presence of narcotics, the officers had probable cause to search the vehicle.
I.
A.
On September 21, 2005, Maryland State Trooper David McCarthy (Trooper McCarthy) was conducting drug interdiction on Interstate 95.[1] At approximately 11:57 a.m., Trooper McCarthy stopped a white Ford Taurus with Georgia plates for speeding northbound in Cecil County, Maryland. He approached the passenger side of the vehicle and noticed an open cell phone line and several other cell phones in the vehicle’s console. Trooper McCarthy asked the driver, the car’s sole occupant, for his license and registration and directed him to close the open cell phone. Trooper McCarthy noticed that the driver’s hands were shaking “uncontrollably” while he gathered the requested paperwork and that he appeared extremely nervous. (J.A. 170)
The driver produced a United States Virgin Islands driver’s license and a rental agreement for the Taurus. When Trooper McCarthy asked for his current address, the driver stated that he was living in Washington, D.C. The rental agreement, however, listed a Maryland address. When Trooper McCarthy asked the driver why he used a Maryland address to rent the car if he lived in Washington, D.C., the driver hesitated, and “eventually” said that it was his girlfriend’s address. (J.A. 170) According to Trooper McCarthy, the driver’s nervousness persisted.
Trooper McCarthy returned to his vehicle. He examined the license and immediately suspected that it was fraudulent, but was unable to verify its authenticity because the Maryland State Police do not *183 have access to a database that includes the Virgin Islands. Based on his interaction with the driver, Trooper McCarthy requested that Trooper Catalano and his canine unit respond to the scene. He then proceeded to conduct a warrant check in the name of Kevin Kairo. Approximately two minutes later, the warrant check was returned negative.
Around the time that Trooper McCarthy was reviewing the driver’s paperwork, Troopers Connor and Lewis arrived at the scene. Trooper Connor also thought the license looked suspicious, and approached the driver, who was still seated in his vehicle. When Trooper Connor asked the driver about his destination, he informed the trooper that he was traveling to New York City to play soccer.
Troopers McCarthy and Connor discussed the driver’s statements and nervous demeanor, and both observed that there was no visible luggage in the back seat. They also noticed that the rental car was due to be returned in Maryland in only a few hours despite the driver’s plans to visit New York City.
Trooper Catalano and his drug detection dog arrived on the scene shortly after Troopers Connor and Lewis, at approximately 12:08 p.m. The driver was asked to exit the vehicle during the scan pursuant to standard procedure. At 12:10 p.m., the dog scanned the exterior of the vehicle and alerted to the presence of narcotics at the front passenger window. Based on the canine’s positive alert, the troopers searched the car and discovered $55,729 in cash inside a nylon bag located on the front passenger seat. The driver claimed that he owned the bag but did not know how the money got inside the bag. The canine then conducted a scan on the cash and alerted to the presence of narcotics.
The driver was taken into custody and brought to the Maryland State Police barracks to verify his identity. A finger print identification check sent to the Federal Bureau of Investigation (FBI) failed to produce results. The state police then contacted the United States Bureau of Immigration and Customs Enforcement (ICE). Agent Robin Betkey responded and contacted the U.S. Virgin Islands Police. Agent Betkey’s contact in St. Croix informed her that there was no valid driver’s license in the name of Kevin Kairo and the address on the license did not exist in St. Thomas. Agent Betkey then searched for the driver’s fingerprints in the ICE database. The ICE database identified the driver as Kevin Newland, a citizen of Jamaica who was lawfully present in the United States. The database also revealed that there was an outstanding warrant for Mr. Newland’s arrest in Maryland for possession of a controlled substance with intent to distribute.
A subsequent FBI analysis proved that the driver’s license and U.S. Virgin Island’s birth certificate, which was provided by Mr. Newland’s wife at the police barracks, were fraudulent. Mr. Newland was charged with falsely and willfully representing himself to be a citizen of the United States in violation of 18 U.S.C. § 911.
B.
Mr. Newland filed a motion to suppress the birth certificate, money seized, and all subsequent statements made to law enforcement officers after Trooper McCarthy received the negative warrant check. At the suppression hearing, Trooper McCarthy testified that he detained Mr. Newland because he suspected that the driver’s license was fake and therefore could not properly execute the warning ticket without knowledge of the driver’s true identity. He also testified that he detained Mr. Newland based on the totality of the cir *184 cumstances, which included Mr. Newland’s statements and nervous demeanor during their initial discussion at the road side.
Troopers McCarthy and Connor both testified at the suppression hearing that the license was an obvious fake and that Mr. Newland’s detention was therefore reasonable based on the totality of the circumstances. The district judge questioned both troopers thoroughly about their reasons for believing the license was fraudulent. Trooper McCarthy testified that the hologram was faded and distorted. Trooper Connor testified that the font on the license was of poor quality and that it was thicker than a standard license. He also testified that the grey haze behind the lettering indicated that the license was not authentic.
The district judge closely examined the license based on the testimony of the troopers. The court also compared the license to a proffered Maryland license to compare its width and length. Despite close scrutiny, the district judge did not discern the abnormalities described by the troopers. The trial judge proceeded to find that the U.S. Virgin Islands driver’s license was not an “obvious fake.” [J.A. 138] Based on this finding, the court found that Trooper McCarthy’s suspicion about the license did not justify the trooper’s decision to detain Mr. Newland once he received the negative warrant check. The court further found that Trooper McCarthy needed reasonable suspicion of a serious crime to continue to detain Mr. New-land beyond the warrant check. The trial court found that Trooper McCarthy’s testimony failed to articulate such a suspicion, and granted Mr. Newland’s motion to suppress.
II.
We first address Mr. Newland’s motion to dismiss. On October 31, 2006, Mr. Newland moved to dismiss this appeal because the Government failed to file a timely Certification of the United States Attorney in accordance with 18 U.S.C. § 3731. “Section 3731 permits the United States to file an interlocutory appeal from an adverse suppression ruling (before the defendant has been put in jeopardy and before the verdict or finding on an indictment or information) only if it makes that certification to the district court.” United States v. DeQuasie, 373 F.3d 509, 515 (4th Cir.2004). We have previously expressed our assumption that the certification must be filed within the same 30-day period for which the United States must notice an appeal under § 3731. See DeQuasie, 373 F.3d at 515 n. 6; In re Grand Jury Subpoena, 175 F.3d 332, 337 (4th Cir.1999).
“The certification requirement of Section 3731 operates to ensure that before the United States interrupts a criminal proceeding (and thereby delays a defendant from obtaining resolution of the charges against him) by taking an interlocutory appeal, it has evaluated whether the appeal is warranted.” DeQuasie, 373 F.3d at 515. “The certificate is not a mere formality; its purpose is to protect the accused from undue delay.” United States v. Herman, 544 F.2d 791, 794 (5th Cir. 1977). That purpose is thwarted by the perfunctory filing of the certificate after the appeal has been docketed and briefed. We have previously warned the Government that “future failures to timely file will not be taken lightly.” United States v. Hatfield, 365 F.3d 332, 338 (4th Cir. 2004). We now have two additional appeals raising the same issue, this case and United States v. McNeill, 484 F.3d 301 (4th Cir.2004), which is being decided with this case. Although there is no assertion that the Government acted in bad faith or with a dilatory motive, its actions have *185 caused a significant procedural flaw in this appeal and in McNeill.
We have outlined several factors to determine whether an appeal should proceed despite the § 3731 irregularity: (1) how late the certification was filed, (2) the reason for its lateness, (3) whether the Government engaged in a “conscientious preappeal analysis” and is appealing in good faith, (4) whether the Government acknowledges the importance of the certification, (5) prejudice to the defendant, (6) the need for appellate clarification of novel or complex legal issues, and (7) “whether the appeal should be heard in the interests of justice.” Hatfield, 365 F.3d at 337-38; see also DeQuasie, 373 F.3d at 516.
In short, because the certification requirement is intended to protect the defendant from undue delay, the most salient factors to consider must relate to whether the Government’s failure to file the certification as required caused actual substantial prejudice to the defendant. See De-Quasie, 373 F.3d at 517 (Courts are not likely to dismiss an appeal unless the defendant is able to show “actual substantial prejudice”) (quoting United States v. Smith, 263 F.3d 571, 578 (6th Cir.2001)).
Oral argument was heard on this appeal on September 21, 2006. The Government did not file the certificate until October 13, 2006, almost eight months after the Notice of Appeal was filed. This is a serious delay and a large lapse in professionalism on the part of the Government. However, in consideration of the McNeill case and the Government’s articulated position, several factors tilt the equities of retaining this appeal in the Government’s favor.
As previously stated, there is no suggestion that the government acted in bad faith or with a dilatory motive. The suppression hearing below was handled by an Assistant United States Attorney who left the United States for official duty in Iraq shortly after his filing the Notice of Appeal in this case. Before leaving the country, he communicated with the Appellate Section of the Criminal Division, Department of Justice, and began the process of obtaining the permission of the Solicitor General to pursue this appeal. An Order was issued by this Court on March 7, 2006, setting a briefing schedule. As a result, the case was transferred to Gregory Welsh, the Assistant U.S. Attorney now handling this appeal. On April 10, 2006, the appeal was authorized by the Solicitor General.
Section 3731 does not give a deadline by which the government must file the certification. We have assumed, however, without deciding, that because it is necessary to the perfection of an appeal, the government must file the certification within the 30-day period for appeal of the interlocutory order. See 18 U.S.C. § 3731; DeQuasie, 373 F.3d at 515 n. 6; In re Grand Jury Subpoena, 175 F.3d at 337. To give effect to the § 3731 protections and to remove doubt about when it must be filed, we now hold, in conjunction with McNeill, that the certification must be filed with the notice of appeal filed by the Government under § 3731. This requirement assures that the Government will have determined that the appeal is warranted under § 3731 before disrupting the trial process by noticing an appeal. In imposing this requirement, we join other courts that have imposed a similar requirement. See, e.g., United States v. Salisbury, 158 F.3d 1204, 1207 (11th Cir.1998); United States v. Bailey, 136 F.3d 1160, 1163 (7th Cir.1998).
The U.S. Attorney’s Office did not realize its omission in this case until October 12, 2006, when the United States Attorney himself realized that the certification he had signed in McNeill had been filed in *186 this Court, not the district court as required by § 3731. This prompted the U.S. Attorney to check with the Assistant U.S. Attorney handling this case (a similar interlocutory appeal) to inquire whether the § 3731 certificate had been properly filed. The U.S. Attorney learned that a certificate had not been filed, and directed that a certificate be properly filed in this case and in McNeill.
This omission went unnoticed not only by the Government, but also by Mr. New-land, his counsel, and this Court. We question whether the omission would have ever been noticed had the Government not filed the certification. However, rather than ignore an irregularity created by his office, the U.S. Attorney himself stepped in to address the problem and rightly filed the certification in both cases. The U.S. Attorney also filed a declaration as an attachment to the Government’s opposition that announced a new § 3731 policy for that U.S. Attorney’s office. Specifically, the U.S. Attorney instituted a new guideline regarding § 3731 certifications that was circulated to all of his assistants and each U.S. Attorney in the Fourth Circuit. He amended the U.S. Attorney practice manual for his office and requested similar amendments to the manuals issued by the Department of Justice. It is thus clear that the Government acknowledges the importance of the certification requirement.
Most important, Mr. Newland does not appear to have suffered actual substantial prejudice from the delayed certification. Mr. Newland contends that he was prejudiced because at the time of his arrest he faced additional charges in another jurisdiction and was delayed in obtaining resolution of those charges. Mr. Newland was detained for approximately five months on the instant charge before he was transferred to the other jurisdiction upon the filing of the notice of appeal in this case. The appeal itself proceeded on time despite the delayed certification. As no one contends that the Government is required to file a § 3731 certification before the notice of appeal, it is difficult to find that Mr. Newland suffered substantial prejudice. We do not think that a timely certification would have affected his transfer to a separate jurisdiction.
Here, as in DeQuasie, the issues raised on appeal are significant and will further assist in defining the boundaries drawn by the Fourth Amendment. Although not every factor articulated here supports the Government’s position, the interests of justice weigh in favor of exercising our discretion to hear this appeal.[2] Accordingly, we deny Mr. Newland’s motion to dismiss. We now turn to the merits.
III.
A.
The determination of whether given facts amount to reasonable suspicion vel non is a legal one, which we review de novo. United States v. Foreman, 369 F.3d *187 776, 782 (4th Cir.2004). We give deference, however, to the trial court’s factual determinations. Id. “[A] reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.” Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).
B.
The Government argues that the trial judge erroneously ruled that the canine sniff occurred outside the scope of the traffic stop. The Government also asserts that, based on the totality of the circumstances, Trooper McCarthy had the requisite suspicion to detain Mr. Newland until the canine scanned the vehicle.
Mr. Newland contends that the district court correctly concluded that Trooper McCarthy unreasonably prolonged the traffic stop in violation of the Fourth Amendment. He concedes that he was lawfully detained, but asserts that his rights were violated when he was held for thirteen minutes while Trooper McCarthy followed his “hunch” that Mr. Newland’s nervousness and conflicting answers signaled that criminal activity was afoot. Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
The Fourth Amendment guarantees “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.” U.S. Const, amend. IV. “Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief and limited purpose, constitutes a seizure of a person within the meaning of the Fourth Amendment.” United States v. Brugal, 209 F.3d 353, 356 (4th Cir.2000) (quoting Delaware v. Prouse, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)). As with other categories of police action subject to Fourth Amendment constraints, the reasonableness of a road side seizure “must strike a balance between the public interest and the individual’s right to personal security free from arbitrary interference by law officers.” United States v. Brignoni-Ponce, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).
We previously defined the proper scope of a routine traffic stop in United States v. Rusher, explaining that “an officer may request a driver’s license and vehicle registration, run a computer check and issue a citation.” 966 F.2d 868, 878 (4th Cir.1992). However, once “the driver has produced a valid license and proof that he is entitled to operate the vehicle he must be allowed to proceed on his way....” Id. at 876. A seizure “justified solely on the basis of issuing a citation can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.” Illinois v. Caballes, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). Thus, once the traffic stop is complete, any continued detention of the driver violates the Fourth Amendment unless the officer develops a reasonable, articulable suspicion of a serious crime. Florida v. Royer, 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); Foreman, 369 F.3d at 781.
The concept of reasonable suspicion is “a commonsensical proposition” and the trial courts “are not remiss in crediting the practical experiences of officers who observe, on a daily basis, what transpires on the street.” United States v. Lender, 985 F.2d 151, 154 (4th Cir.1993). The standard of reasonable suspicion does, however, require “a minimum level of objective justification for the police action.” Brugal, 209 F.3d at 359 (quoting Illinois v. Wardlow, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)). It demands more *188 than an officer’s “inchoate and unparticularized suspicion” or “hunch that criminal activity is afoot.” Brugal, 209 F.3d at 359 (quoting Terry, 392 U.S. at 27, 88 S.Ct. 1868). In the context of a routine traffic stop, the “articulated factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied.” Foreman, 369 F.3d at 781.
C.
We think the reasoning of the trial court here departs from our decisions in Foreman and Brugal. See Foreman, 369 F.3d at 782; Brugal, 209 F.3d at 359. “The Supreme Court has recognized that factors consistent with innocent travel can, when taken together, give rise to reasonable suspicion.” Brugal, 209 F.3d at 359 (citing United States v. Sokolow, 490 U.S. 1, 9, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)). Simply put, an officer is not required to ehminate the possibility of innocent conduct for the seizure to pass constitutional muster. United States v. Arvizu, 534 U.S. 266, 277, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (citing Wardlow, 528 U.S. at 125, 120 S.Ct. 673).
Here, Trooper McCarthy, an officer with special training and experience in the identification of drug trafficking and who had seen “probably hundreds of fake identification[s]” prior to stopping Mr. Newland, (J.A. at 42), immediately believed that Mr. Newland’s license was fake. At the suppression hearing, both McCarthy and Trooper Conner, who also possesses extensive experience with fake identifications, described in some detail the reasons for their suspicions about Mr. Newland’s license. Although the district court discounted the officers’ observations about the license based on its own inspection, the court never made an adverse credibility finding about their testimony, and the court acknowledged that it does not look at fake driver’s licenses “on a routine basis.” (J.A. at 156.)
Also, Mr. Newland was traveling on I-95, a major thoroughfare for narcotics trafficking. Brugal, 209 F.3d at 358 n. 5 (1-95 is a well known drug corridor); Foreman, 369 F.3d at 785 (characteristics of location in which the officer encounters vehicle is a significant factor in formulating reasonable suspicion) (citing Brignoni-Ponce, 422 U.S. at 884, 95 S.Ct. 2574). In fact, 1-95 is so well known for its use by drug traffickers that this circuit has twice recognized that travel on 1-95 is a valid factor in a reasonable suspicion analysis. Brugal, 209 F.3d at 358 n. 5; United States v. Raymond, 152 F.3d 309, 311 (4th Cir.1998). In addition, each state in this circuit through which 1-95 passes has acknowledged its reputation as a drug corridor. (J.A. 37) (Maryland); United States v. Vidal, 119 Fed.Appx. 510, 511 (4th Cir.2005) (citing Brugal with approval for the proposition that travel on 1-95 is a factor contributing to reasonable suspicion); United States v. Bodie, 983 F.2d 1058, 1059 (4th Cir.1992) (Virginia) (defendants apprehended on 1-95 in close proximity to heavy drug trafficking area); Limonja v. Com., 8 Va.App. 532, 383 S.E.2d 476, 482 (1989) (I-95 North a known drug trafficking route); United States v. Thorpe, 36 F.3d 1095, 1096 (4th Cir.1994) (North Carolina); Brugal, 209 F.3d at 358 n. 5 (South Carolina). Although we have not yet taken judicial notice of this fact, we do so now, and recognize 1-95 as a major thoroughfare for narcotics trafficking.[3]
*189 When Mr. Newland produced his license and rental agreement, his hands “were shaking uncontrollably.” (J.A. 170); Wardlow, 528 U.S. at 124, 120 S.Ct. 673 (physical signs of nervousness and evasive behavior is a pertinent factor in determining reasonable suspicion)(citing Brignoni-Ponce, 422 U.S. at 885, 95 S.Ct. 2574 (same)); Sokolow, 490 U.S. at 8-9, 109 S.Ct. 1581 (same); Florida v. Rodriguez, 469 U.S. 1, 6, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984) (same); Foreman, 369 F.3d at 785 (same). Although Mr. Newland’s shaky hands alone are not sufficient to establish reasonable suspicion, we should not discount Trooper McCarthy’s ability to ascertain the severity of Mr. Newland’s nervousness in comparison to the behavior of motorists he has encountered in the past. See Lender, 985 F.2d at 154 (courts are not remiss in crediting the practical experiences of officers who observe, on a daily basis, what transpires on the street); Foreman, 369 F.3d at 785 (shaking hands indicative of nervousness and pertinent factor in reasonable suspicion determination).
Mr. Newland also provided three different and conflicting addresses to Trooper McCarthy—St. Thomas, Washington, D.C., and Maryland. He also observed Mr. Newland’s obvious hesitation when asked to explain why the Maryland address was used on the rental agreement. See Wardlow, 528 U.S. at 124, 120 S.Ct. 673 (evasive behavior and hesitation during questioning are pertinent factors in determining reasonable suspicion).
In addition, Trooper McCarthy testified that he noticed multiple cell phones in the vehicle’s console. While the presence of multiple cell phones, by itself, may not be suspicious, when taken together with the other circumstances present in this case, this factor contributes to the process of elimination of a substantial portion of innocent travelers. Foreman, 369 F.3d at 781.
Under the totality of these circumstances, it was not unreasonable for Trooper McCarthy to suspect that Mr. Newland was trafficking narcotics. Brugal, 209 F.3d at 361-62 (use of rental vehicle common method to transport drugs); Wardlow, 528 U.S. at 125, 120 S.Ct. 673 (determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior). Trooper McCarthy’s suspicion was further reinforced by Troopers Connor and Lewis, who arrived “shortly” after Trooper McCarthy had called for back up. (J.A. 45.) When Trooper Connor asked Mr. Newland about his destination, he stated that he was on his way to New York City, a known narcotics source city, to play soccer. See Brugal, 209 F.3d at 361-62 (travel on known drug corridor coupled with rental car and destination to New York, a known source city, all factors contributing to reasonable suspicion). In addition, Troopers McCarthy and Connor testified that they were suspicious about Mr. New-land’s travel plans because the Maryland rental agreement was due to expire later that afternoon, despite the defendant’s plans to travel to New York. The troopers also noted no visible luggage in the car. Brugal, 209 F.3d at 359 (noting unusual travel plans and inadequate luggage as factors contributing to reasonable suspicion).
In United States v. Arvizu, the Supreme Court found that children waiving in a mechanical fashion to a border patrol agent from the rear window of a minivan was, standing alone, a seemingly innocuous event, but when coupled with the remote *190 location of the minivan, its presence on a route frequented by drug smugglers, the evasive behavior of the driver, and the elevated position of the passengers’ feet, his observations were enough to amount to reasonable suspicion. 534 U.S. 266, 277, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). The Supreme Court has consistently rejected attempts by lower courts to evaluate and reject factors in isolation from each other because this approach “does not take into account the ‘totality of the circumstances’ as our cases have understood that phrase.” Id.
In our opinion, the factors articulated by Trooper McCarthy, a state trooper with six years of experience, eliminate a substantial portion of innocent travelers.[4] Foreman, 369 F.3d at 785 (nervous behavior, coupled with travel on known drug corridor in a rental vehicle and destination to New York City, a known source city, and unusual travel plans sufficient to establish reasonable suspicion); see Arvizu, 534 U.S. at 274-75, 122 S.Ct. 744 (rejecting evaluation of “innocent travel” factors in insolation from each other and advising against a “divide-and-conquer” approach when determining sufficiency of reasonable suspicion).
The information supplied by Mr. New-land justified a lengthier stop. We conclude that it was reasonable to detain Mr. Newland long enough for the canine unit to arrive and confirm or deny Trooper McCarthy’s suspicions. The canine drug scan began approximately thirteen minutes after Mr. Newland was stopped. Given the totality of the circumstances, we cannot say that Troopers Cooper and Lewis’ response time made the length of the stop unreasonable. There was also no unreasonable delay caused by Trooper Catalano. The whole affair lasted less than fourteen minutes. Once the canine alerted to the presence of drugs, the troopers had probable cause to search the vehicle. United States v. Jeffus, 22 F.3d 554, 557 (4th Cir.1994). Accordingly, we reverse the holding of the district court and deny the motion to suppress.
rv.
We disagree with the Government’s position that Newland was required to file a cross-appeal to assert his argument contesting probable cause for his arrest. This argument is essentially an alternate legal theory to affirm the district court’s suppression order and would not expand his rights under that judgment. See United States v. American Railway Express Co., 265 U.S. 425, 435-36, 44 S.Ct. 560, 68 L.Ed. 1087 (1924). However, it is clear from the record that the presiding judge was primarily concerned with the facts and events leading up to the canine scan. (J.A. 149) At the suppression hearing, when the parties attempted to explore the issue, the court expressed that it was primarily concerned with the events before the canine search and encouraged the parties to return to that issue. (J.A. 141). Thus, we think the record may be insufficient to carefully scrutinize whether the troopers had probable cause to arrest Mr. Newland and at least unclear whether the parties had a full opportunity to introduce evidence on that issue. Walker v. True, 399 F.3d 315, 326 (4th Cir.2005). The record is further unclear regarding whether the district court actually ruled on the probable cause issue because the transcript of the suppression hearing does not reflect an *191 application of the probable cause standard, or any explicit ruling on the propriety of the arrest. Accordingly, we remand the probable cause issue to the district court for further development.
V.
For the reasons stated herein, we reverse the suppression order and remand this case to the district court for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

. Trooper McCarthy is a member of Pro-Active Criminal Enforcement Team, a state police task force specifically trained to identify possible drug traffickers on 1-95. (J.A. 37.)

. Although the entire Justice Department was certainly on notice of Hatfield and DeQuasie, as a practical matter we realize that he Government is not an omniscient monolith, and this is particularly significant when one considers that both Hatfield and DeQuasie involved the same U.S. Attorney’s office in a state other than Maryland. We note that the U.S. Attorney for the District of Maryland has requested that the Appellate Section of the Criminal Division of the Department of Justice make it a policy to ensure the filing of the § 3731 certification whenever the Solicitor General approves such an appeal. Whether instituted by the Solicitor General, the Criminal Division, or each U.S. Attorney, we strongly encourage the Government to adopt such a policy as soon as practicable. In the wake of this opinion and McNeill, any reason offered by the Government for a future failure to file a timely § 3731 certification will be viewed, at best, with skepticism.

. Courts of Appeals may take judicial notice of any fact not subject to reasonable dispute if it is generally known within the territorial jurisdiction of the trial court and is capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably *189 questioned. Fed.R.Evid. 201(f) (judicial notice may be taken at any stage of proceeding); Flath v. Bombardier, Inc., 217 F.3d 838 (4th Cir.2000).

. Because we conclude that Officer McCarthy had reasonable suspicion to detain Mr. New-land until the arrival of the canine unit, it is not necessary to address whether the canine scan occurred within the scope of Mr. New-land’s concededly lawful traffic stop, as the Government asserts. See Caballes, 543 U.S. at 407, 125 S.Ct. 834.